**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DORETHA BANKS and ANTOINE MASSIE, | ) ) ) | |
| Plaintiffs, | ) ) | No. 18 C 03358 |
| v. | ) ) | Judge John J. Tharp, Jr. |
| LOANCARE LLC and FIRST ALLEGIANCE PROPERTY SERVICES, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Doretha Banks and Antoine Massie sued their mortgage loan servicer, LoanCare LLC, and First Allegiance Property Services, Inc. based on a series of events that began with a failed loan modification agreement and ended in their eviction and the theft of their personal property. Banks and Massie rest their claims on several legal theories, including violation of the Illinois Consumer Fraud Act, common law fraud, intentional infliction of emotional distress, conversion, breach of contract, unconscionability, and loss of consortium. LoanCare and First Allegiance have moved to dismiss Banks and Massie's second amended complaint ("SAC"), which was filed after this Court granted the defendants' motion to dismiss the first amended complaint but with leave to amend. For the reasons discussed below, the motions to dismiss the SAC are granted and the dismissal is with prejudice.

## BACKGROUND

The court assumes familiarity with its previous opinion in this case, and accordingly relates only the facts relevant to the present motion. *See* Mem. Op. and Order, ECF No. 58. Banks and Massie are a married couple who entered a mortgage loan agreement with Hartford Financial

Services in February 2009 for their Richton Park, Illinois home. SAC ¶¶ 3, 18. In March 2011, their home was foreclosed upon, following an alleged mortgage default, and Banks' appeal of the foreclosure suit was dismissed in February 2017. *Id.* ¶¶ 20-21.

In April 2017, Banks contacted LoanCare, her loan servicer, and spoke with a representative who stated that she might qualify for a loan modification. *Id.* ¶ 28. Banks completed LoanCare's loss mitigation package and received a notice of receipt on May 15, 2017. *Id.* ¶¶ 29-31. Soon thereafter, a LoanCare agent called Banks to inform her that she had been approved for loss mitigation through a loan modification and would need to make monthly payments of roughly $1,800. *Id.* ¶ 32. The agent further informed her that she would receive the FHA Trial Payment Plan Agreement (TPP) in the mail and that her first payment under the program would constitute acceptance of the agreement. *Id.* ¶¶ 34-35. Banks signed and returned the TPP and made the first payment via telephone at the end of June. *Id.* ¶¶ 35, 38. Relying on the TPP and assuming the eviction would no longer take place, Banks and Massie ended their search for a new house. *Id.* ¶ 40. Banks made the second and third TPP payments in July and August 2017. *Id.* ¶¶ 39-42.

On August 16, 2017, Massie and two of their children were evicted from their home, and in the process, Massie was arrested for trespassing. *Id.* ¶¶ 43-44. During the eviction, six individuals moved furniture from inside the plaintiffs' home to the front yard and garage. *Id.* ¶ 45. According to Banks and Massie, these individuals worked for First Allegiance and damaged and destroyed their furniture in the process. *Id.* ¶ 49. While packing up their belongings into a rental truck, the plaintiffs discovered valuables and money missing, including $4,600 from a dresser, most of their jewelry, and four of their children's iPads. *Id.* ¶ 50.

After Banks and Massie had moved their possessions to storage and relocated to a nearby hotel, they called LoanCare and were informed that the company would not honor their loan

agreement. *Id.* ¶ 54. LoanCare had not notified Banks that she did not qualify for loss mitigation prior to or after the eviction. *Id.* ¶ 56. The day after the eviction, Banks telephoned First Allegiance to report the theft of their belongings. *Id.* ¶ 57. A First Allegiance representative informed her that the company had hired Maurice Johnson to evict them from their property, at LoanCare's direction. *Id.* ¶ 58. Upon information and belief, the plaintiffs allege that the "Johnson" responsible for their eviction was, in reality, Conchita M. Johnson. *Id.* ¶ 138.

The Court dismissed the plaintiffs' first amended complaint for failure to state a claim for relief but granted leave to amend. ECF No. 58. Banks and Massie timely filed a second amended complaint, which LoanCare and Allegiance have separately moved to dismiss for failure to state a claim. *See* ECF No. 66; ECF No. 70. Following the withdrawal of their counsel, Banks and Massie failed to respond to the motions to dismiss, despite being granted an extension to do so.

## DISCUSSION

In reviewing a motion to dismiss, the Court accepts all well-pleaded facts as true and draws all inferences in the light most favorable to the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007). Where the plaintiff fails to respond to a motion to dismiss, as is the case here, the Court must still find the defendant entitled to relief under Rule 12(b)(6). *See Marcure v. Lynn*, 992 F.3d 625, 633 (7th Cir. 2021) ("Rule 12(b)(6) prevents courts from granting unopposed motions solely because there is no response."). In the absence of a response brief, the Court will look to the complaint to test the sufficiency of the pleadings. *Id.* at 633 n.5.

As a threshold matter, it is necessary to distinguish between "claims" and "counts." "A claim is the aggregate of operative facts which give rise to a right enforceable in the courts." *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 399 (7th Cir. 2012) (cleaned up). Counts state legal theories, thus serving as the vehicle through which a plaintiff may seek liability and damages.

3

*Volling v. Antioch Rescue Squad*, 999 F. Supp. 2d 991, 996 (N.D. Ill. 2013). To survive a motion to dismiss, then, there must be at least one cognizable theory of liability to support each claim for relief asserted in the complaint.

Banks and Massie's allegations encompass three potential claims against LoanCare and one against First Allegiance: their eviction (LoanCare), the theft of their personal property (both defendants), and the failure to fulfill the loan modification agreement (LoanCare). To support these claims, Banks and Massie invoke the following legal theories: violation of the ICFA (Count I), common law fraud (Count II), intentional infliction of emotional distress (Count III), conversion (Count IV), breach of contract (Count V), procedural and substantive unconscionability (Count VI), and loss of consortium (Count VII).[1] The Court addresses each theory of liability by its corresponding claim, rather than in the numerical sequence of the SAC's counts.

## I.      August 2017 Eviction

As this Court discussed in its first memorandum opinion and order, Banks and Massie's eviction remained separate from their loan modification agreement with LoanCare. Banks and Massie previously argued that the agreement induced their belief that they maintained a current interest in the property and would not be evicted from it. But, as the Court noted, "because the eviction itself was not precluded by the loan modification agreement, the plaintiffs have no claim to recover from LoanCare arising directly from its actions in enforcing its right to possession of the property." Mem. Op. and Order at 7, ECF No. 58. Consequently, the Court dismissed any claim that sought to hold the defendants liable for the plaintiffs' eviction from the property itself with prejudice. *Id.* at 11.

---

[1] Subject matter jurisdiction over these state law theories is based on diversity of citizenship. See SAC ¶¶ 4 and 8-10.

4

In the SAC, however, Banks and Massie allege that LoanCare violated the ICFA because the plaintiffs relied on LoanCare's promise of loss mitigation to cease their relocation search, believing they would not be evicted from their home. Banks and Massie argue that though LoanCare had the right to evict them, they did not have the right to deceive them by presenting loss mitigation as a valid alternative to eviction. This argument merely rephrases that of the first amended complaint. It is based on the mistaken premise that the TPP precluded eviction, which it explicitly did not. *See* Pl.'s Ex. B at 2, ECF No. 1-2 [hereinafter "TPP"] ("Our acceptance and posting of your payment during the Trial Period Plan will not be deemed a waiver of the acceleration of your loan and related activities, including the right to resume or continue foreclosure"). The plaintiffs seek to hold LoanCare liable for their lawful eviction, which the Court has already found to be a non-cognizable claim. As a result, Count I is dismissed.

## II.    Theft of Personal Property

Banks and Massie bring a conversion theory of liability against both LoanCare and First Allegiance based on the theft of their personal property during the eviction. To successfully plead conversion, a plaintiff must show: "(1) a right to the property; (2) an absolute and unconditional right to the immediate possession of the property; (3) a demand for possession; and (4) that the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Van Diest Supply Co. v. Shelby Cty. State Bank*, 425 F.3d 437, 439 (7th Cir. 2005).

The defendants do not dispute, nor can they on a motion to dismiss, that the plaintiffs' belongings were stolen during the eviction. The only issue in contention is whether the theft can be imputed to First Allegiance and LoanCare, neither of which had employees on the scene during the eviction. Under the doctrine of respondeat superior, a principal may be held liable for his or her employee's torts if it is "committed by an agent within the scope of the agent's actual or

apparent authority." *Tippecanoe Beverages, Inc. v. S.A. El Aguila Brewing Co.*, 833 F.2d 633, 637 (7th Cir. 1987). If the tortfeasor is an independent contractor, however, liability will not be vicariously imposed on to the principal. *Anderson v. Marathon Petroleum Co.*, 801 F.2d 936, 938 (7th Cir. 1986). The distinction between an employee and an independent contractor lies in the degree of control an employer exerts over the individual's work. *Sotelo v. DirectRevenue, LLC*, 384 F. Supp. 2d 1219, 1235 (N.D. Ill. 2005). The question thus becomes whether the individuals who carried out the eviction were agents of First Allegiance and LoanCare or independent contractors, which the plaintiffs failed to establish in their first amended complaint.

The plaintiffs' allegations on this subject start off on a puzzling note. According to Banks and Massie, First Allegiance informed them that it had hired Maurice Johnson to conduct their eviction, at the direction of LoanCare.[2] Yet, the plaintiffs allege, on information and belief, that "Johnson is Conchita M. Johnson," whom they identify as an agent of First Allegiance based on the criminal complaint filed against Massie.[3] Presumably, Banks and Massie are alleging that First Allegiance either misidentified the individual who carried out the eviction or that Maurice Johnson and Conchita M. Johnson are one and the same. The Court is left to guess at the discrepancy. Banks and Massie further argue that First Allegiance exerts control over its partners' work, as evidenced by its website's statement about its work with contractors, quality assurance training, contractor training, and its use of technology to control its work process.

---

[2] Though the plaintiffs do not clarify their reference to "at the direction of," presumably they allege that LoanCare hired First Allegiance to conduct the eviction, which in turn hired Johnson.

[3] The plaintiffs cite to the criminal complaint filed against Massie for damaging property during the eviction, in which the complainant is named as "Conchita M. Johnson (on behalf of First Allegiance Bank)."

First Allegiance does not fully dispel the confusion surrounding the identity of the individual conducting the eviction. Instead, it asserts that the plaintiffs named Conchita M. Johnson to plead a new theory of liability, rather than curing the defects of their first amended complaint. First Allegiance explains that it contracted with H&J Property Maintenance LLC to carry out the plaintiffs' eviction. Their "Independent Contractor Status Agreement" with H&J Property stipulated that H&J Property "shall at all times, be classified as an independent contractor" with "the full authority to direct and control the performance of Services provided to First Allegiance" and "will not in any way act as or hold itself out to be an agent for First Allegiance." Def.'s Ex. A, ECF No. 71-1.[4] Further, First Allegiance's database of independent contractors lists Maurice Johnson as the contact person for H&J Property.

Under Illinois law, an independent contractor agreement may be probative of an individual's employment status, though not necessarily determinative. *See In re Dealer Management Sys. Antitrust Litigation*, 362 F. Supp. 3d 558, 567 (N.D. Ill. 2019) ("While the parties' characterization of their relationship as an employer/independent contractor is not dispositive of the issue before the Court, it is probative of the intended nature of the relationship") (quoting *K.C. 1986 Ltd. P'ship v. Reade Mfg.*, 33 F. Supp. 2d 820, 828 (W.D. Mo. 1998)) (cleaned up); *Nationwide Mut. Ins. Co. v. Gretchen Courtney & Assocs.*, 2013 WL 3790912, at *11 (N.D. Ill. July 19, 2013) (quoting *McConnell v. Freeman United Coal Co.*, 198 Ill. App. 3d 322, 327,

---

[4] Typically, the Court is restricted to considering the complaint on a motion to dismiss, but an exception exists for "documents that are critical to the complaint and referred to in it." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). A court may also consider documents that are not explicitly referred to in the complaint if it would be "impossible for the district court . . . to evaluate the disagreement between the parties" without it. *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002). Although the plaintiffs do not explicitly refer to the Independent Contractor Status Agreement in their complaint, it would not be possible for this Court to determine the status of those who conducted the eviction, and may be liable for the theft of the plaintiffs' belongings, without it. As a result, it falls within the "critical document" exception.

555 N.E.2d 993, 996 (1990) ("The fact that the contract designated [the individual] as an independent contractor is not controlling; rather, the right to control the manner of doing the work is of principal importance in the consideration of this question.").

Even putting aside the independent contractor agreement, Banks and Massie have not sufficiently alleged the existence of an agency relationship between the defendants and the individuals carrying out the eviction, including Johnson. The only fact they identify as support for an agency relationship is Conchita M. Johnson's signature "on behalf of First Allegiance" in the criminal complaint against Massie. Ms. Johnson's signature alone does not reveal any information about her status as an employee or independent contractor of First Allegiance, nor does it establish that she was one of the individuals involved in the eviction. Neither do First Allegiance's statements regarding its work with contractors on its website suggest an agency relationship between itself and H&J Property. The plaintiffs do not allege that the website lists H&J Property as one of its contractors or partners. Further, the statements they summarize, such as "its partnership with contractors, quality assurance training, and contractor impact training and support" are far too vague to plausibly show an agency relationship with each of its partners or contracting organizations. SAC ¶ 141.

Because liability for the theft cannot be imputed to First Allegiance, it cannot be vicariously attributed to LoanCare either, as LoanCare hired First Allegiance to oversee the eviction. Banks and Massie have failed to plead factual allegations supporting an agency relationship between the defendants and the individuals carrying out the eviction, and therefore, the defendants cannot be held liable for the theft of their belongings. Accordingly, this claim is dismissed and with it, Count IV.

### III.    Loan Modification Agreement

The bulk of the plaintiffs' legal theories arise from its failed loan modification agreement with LoanCare. Specifically, Banks and Massie's theories of breach of contract, procedural and substantive unconscionability, common law fraud, intentional infliction of emotional distress, and loss of consortium stem from their agreement with LoanCare. As discussed below, none offers a cognizable theory of liability.

### A.  Breach of contract and unconscionability (Counts V and VI)

To successfully plead breach of contract under Illinois law, a plaintiff must show "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019). The question at the core of the breach of contract theory centers on the first element: whether the TPP was an enforceable contract for a permanent loan modification. Banks and Massie allege that it was enforceable, given that they made all the required payments under the TPP and LoanCare did not revoke the agreement prior to the eviction. LoanCare, by contrast, characterizes the TPP as an unenforceable contract because it lacks the necessary elements of any enforceable contract—offer and acceptance, consideration, and definite and certain terms.

Turning to the TPP, the agreement bills itself as the first step towards qualifying for a permanent loan modification. It sets forth three conditions to receiving a permanent modification: (1) successfully completing the Trial Payment Plan by making the three required monthly payments; (2) submitting two signed copies of the modification agreement; and (3) LoanCare signing the modification agreement. Once LoanCare signs and returns the fully executed modification agreement, the loan is permanently modified. The TPP remains contingent, however,

on the borrower having provided accurate and complete information. LoanCare specifically reserves the right to revoke the TPP if it learns of information that would make the borrower ineligible. The TPP provides that LoanCare will hold the trial payments in an account until there are sufficient funds to pay off the oldest delinquent monthly payment. Notably, the agreement stipulates that LoanCare's acceptance and posting of the TPP payments "will not be deemed a waiver of your loan and related activities, including the right to resume or continue foreclosure, and shall not constitute a cure of your mortgage default unless such payments are sufficient to completely cure the default." TPP at 2. Banks signed and returned the TPP agreement and timely made all three payments, but LoanCare did not countersign and return the agreement.

The Seventh Circuit addressed whether a TPP is an enforceable agreement in *Wigod v. Wells Fargo Bank, N.A*, 673 F.3d 547 (7th Cir. 2012). There, it held that a TPP becomes a binding unilateral offer of a permanent modification once the loan servicer countersigns and returns the agreement to the borrower, provided that the borrower satisfied the TPP's conditions. *Id.* at 562. Under the TPP's terms, Wells Fargo had the opportunity to determine whether the borrower was qualified to receive a loan modification by reviewing her TPP and financial documentation prior to signing it. *Id.* By countersigning the TPP agreement and returning it with a letter approving a trial modification, "an objectively reasonable person would construe it as an offer to provide a permanent modification agreement if she fulfilled its conditions." *Id.* at 563.

Does this interpretation extend to agreements that are not signed by the loan servicer? The consensus appears to be no.[5] In *Golbeck v. Johnson Blmumberg & Associates, LLC*, the court

---

[5] *See McGann v. PNC Bank, Nat. Ass'n*, No. 11-cv-06894, 2013 WL 1337204, at *6 (N.D. Ill. Mar. 29, 2013) (finding lender had no obligation to permanently modify the loan because it did not sign the agreement); *Avevedo v. CitiMortgage, Inc.*, No. 11 C 4877, 2012 WL 3134222, at *8 (N.D. Ill. July 25, 2012) (finding lender's failure to sign the TPP fatal to plaintiff's breach of contract claim because offer of loan modification was "not binding unless and until [the lender]

10

distinguished a non-executed TPP, due to the loan servicer's lack of signature, from that in *Wigod* because "it was the lender's signature that made the TPP a binding offer that could be accepted through performance." No. 16-cv-6788, 2017 WL 3070868, at *6 (N.D. Ill. July 19, 2017). Because the TPP provided that the permanent modification would become effective once both parties signed it, the lack of the loan servicer's signature rendered the agreement non-binding and unenforceable. Further, the court found that though the TPP presented three prerequisites to qualify for a loan modification—making a first trial payment, completing two more payments, then signing and returning the agreement—they were not the ***only*** prerequisites. To obtain the loan modification, the plaintiff could not misrepresent his financial status and was required to set up an escrow account. *Id.* at *6.

The same reasoning applies here. The plaintiffs' TPP specifies that the permanent modification will not take place until "we have signed the modification agreement." Pl.'s Ex. B at 2, ECF No. 1-2. LoanCare's review of the TPP was its last opportunity to verify the plaintiffs' financial information and determine that they qualified before extending a binding offer by signing the agreement. LoanCare, unlike the loan servicer in *Wigod*, did not countersign and return the TPP, and thereby did not execute a binding or enforceable offer of a permanent loan modification.

---

executed the TTP and returned it to the plaintiffs). *See also Pennington v. HSBC Bank USA, N.A.*, 493 Fed. App'x 548, 555-56 (5th Cir. 2012) ("Although the fact that [the plaintiffs] paid under the TPP indicates that they hoped to be bound, the question is whether the bank expressed a similar intent. . . . The lack of a signature from the bank indicates that it did not intend to be bound by the Modification Agreement."); *Taylor v. JP Morgan Chase*, No. 4:16-cv-52, 2017 WL 3754607, at *4 (N.D. Ind. Aug. 30, 2017) (finding no viable breach of contract claim because "Chase was required to execute the TPP but did not" and therefore "no contract was formed"); *Rackley v. JPMorgan Chase Bank, Nat. Ass'n*, No. SA-11-CV-387-XR, 2011 WL 2971357, at *3 (W.D. Tex. July 21, 2011) ("[A]lmost every district court has affirmed 12(b)(6) dismissal of such breach claims on the basis that the borrower's failure to receive an executed Home Affordable Modification agreement prevented the borrower's compliance with all TPP obligations") (collecting cases).

Further, the TPP does not limit the conditions required for a permanent loan modification to the three enumerated above. As noted, under the "Next Steps" section of the agreement, LoanCare stipulated that the agreement was contingent on the plaintiffs' provision of accurate financial information, which the plaintiffs do not allege they provided. More significantly, the agreement explicitly warns that LoanCare's acceptance and posting of the payment does not waive the right to resume or continue foreclosure and will not cure the mortgage default, unless the borrower's payments are sufficient to cure it. That did not appear to be the case for Banks and Massie, as their foreclosure process was well under way when they applied for the loan modification. Given LoanCare's notice that foreclosure might continue and its failure to execute the TPP, the TPP was not an enforceable contract. It follows that without an enforceable contract, there can be no breach of contract.

The plaintiffs' theory of procedural and substantive unconscionability fails for the same reason—the lack of a contract. Courts apply the doctrine of unconscionability to prevent a party from enforcing an unjust contract. *Phoenix Ins. Co. v. Rosen*, 242 Ill. 2d 48, 60, 949 N.E.2d 639, 648 (2011) ("an unconscionability analysis asks whether the agreement, by its formation or by its terms, is so unfair that the court cannot enforce it consistent with the interest of justice"). Unconscionability is therefore premised on the existence of a contract, which is not the case here. Moreover, even if the Court found the TPP to be a valid contract, unconscionability would not apply because it is used to bar enforcement, which is not what the plaintiffs seek to do here. *Id.* at 242 Ill. 2d at 60, 949 N.E.2d at 647 (explaining the difference between substantive and procedural unconscionability, both of which are used to find an agreement unenforceable). As a result, the plaintiffs have failed to plausibly allege both breach of contract and unconscionability.

### B. Common Law Fraud (Count II)

Banks and Massie argue that LoanCare can be held liable under a common law fraud theory of liability because it solicited and offered Banks the TPP with no intention of executing it. They assert that the TPP's representations proved to be false statements. LoanCare maintains, however, that this theory is untenable because the TPP did not contain any false statements of material fact.

Common law fraud requires a showing of: "(1) a false statement of material fact by the defendant, (2) who knew that the statement was false (3) and intended to induce the plaintiff to act in reliance upon the statement, (4) the plaintiff reasonably relied upon the truth of the statement, and (5) the plaintiff suffered damage as a result of action in reliance upon the statement." *Castlerigg Master Investments, Ltd. v. AbbVie, Inc.*, 2021 WL 1213171, IL App (1st) 200527 ¶ 20. The standard for pleading fraud is more stringent than for other legal theories; "plaintiffs must plead the circumstances constituting fraud in detail—the 'who, what, when, where, and how.'" *Tricontinental Industries, Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 833 (7th Cir. 2007) (quoting *Arazie v. Mullane*, 2 F.3d 1446, 1465 (7th Cir. 1993)).

The plaintiffs have not met that burden here. Banks and Massie do not identify any particular statements in the TPP as false representations of material fact and instead, state simply that the "representations in the Agreement" are false. Such an allegation too general to sustain a common law fraud theory of liability under the particularized pleading standard. And, again, the TPP includes no promise that LoanCare would execute the loan modification agreement after review and so involves no misrepresentation as to LoanCare's intent to do so.

### C. IIED (Count III)

Banks and Massie allege intentional infliction of emotional distress against LoanCare because it intentionally and falsely represented that it could execute their loan modification,

resulting in the loss of their TPP payments and severe emotional distress. The crux of an IIED theory under Illinois law is that the conduct involved must be "truly extreme and outrageous." *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 269, 798 N.E.2d 75, 80 (2003). The bar for what qualifies as extreme or outrageous is a high one, as the conduct at issue "must be so extreme as to go beyond all possible bounds of decency and to be regarded as intolerable in a civilized community." *Id.* at 207 Ill. 2d at 270, 798 N.E.2d at 80-81. Failure to modify a loan, even when modification is anticipated, does not clear that bar. *See Bomar v. Pacific Union Financial, LLC*, No. 15-cv-10842, 2016 WL 4206075, at *3 (N.D. Ill. Aug. 10, 2016) (failure to review loan modification application and decision to increase mortgage payments did not constitute extreme or outrageous conduct); *Pendolino v. BAC Home Loans Servicing, LP*, No. 10 C 5916, 2011 WL 3022265, at *5 (N.D. Ill. July 22, 2011) (foreclosure or attempted foreclosure on home for failure to make loan payments did not rise to level of "extreme and outrageous" conduct). Similarly, LoanCare's conduct in providing the plaintiffs with a TPP agreement that it ultimately did not execute does not amount to extreme and outrageous conduct.

### D. Loss of consortium (Count VII)

In their final substantive count, the plaintiffs seek to hold LoanCare liable for loss of consortium. According to Banks and Massie, the stress of the failed loan modification agreement, and the subsequent financial, physical, emotional stress it generated, led to the breakdown of their marriage. Loss of consortium is not an independent cause of action and cannot stand on its own. *Pierce v. Chicago Rail Link, LLC*, No. 03 C 7524, 2005 WL 5999980, at *15 (N.D. Ill. Mar. 15, 2005) ("A loss of consortium claim is derivative in nature, thus its viability depends on the success of the injured spouse's claims."). Because the plaintiffs have failed to plead a viable theory of liability as to the loan modification claim, their loss of consortium theory fails as well.

14

\*     \*     \*

For the reasons discussed, LoanCare's and First Allegiance's motions to dismiss the SAC are granted for failure to state a claim. And because, after three attempts, the plaintiffs have not pled any cognizable theory to support their claims against these defendants, the dismissal is with prejudice. Final judgment will be entered in favor of the defendants.

Dated: September 15, 2021

John J. Tharp, Jr.
  United States District Judge